IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL ACTION NO. |
| v. | 1:15-CR-244-LMM-CMS |
| DWAYNE ANTONIO JACKSON, | |
| Defendant. | |

### REPORT AND RECOMMENDATION

This case is before the Court on Defendant Dwayne Antonio Jackson's Motion to Suppress Evidence. (Doc. 18). An evidentiary hearing on the Motion was held before the undersigned Magistrate Judge on October 14, 2015, and briefing was ordered. (Doc. 21, Transcript of Hearing). On November 12, 2015, Defendant filed a Brief in Support of the Motion to Suppress Evidence. (Doc. 22). The Government filed a Response in Opposition (Doc. 23), and Defendant Replied (Doc. 24).

For the reasons discussed below, **I RECOMMEND** that Defendant's Motion to Suppress Evidence (Doc. 18) **BE GRANTED**.

### I.   FACTS

In the early hours of September 22, 2011, Sergeant Christopher Morris of the McDonough Police Department was called to investigate a shooting in

McDonough, Georgia.  (Tr. at 6).  His investigation led him to be on the lookout for a black male and a white female driving a white Chevrolet Impala.  (Id. at 8).  Later that afternoon, at approximately 2:00 p.m., Sergeant Morris located a car and occupants that fit the description.  (Id. at 13).  With the assistance of a marked Clayton County patrol vehicle, law enforcement officers initiated a traffic stop of the Impala.  (Id. at 14-15).  The vehicle's occupants, who were later identified as Defendant Dwayne Antonio Jackson and his girlfriend Dusty Matheny, were placed under investigative detention and transported to the McDonough Police Department for questioning.  (Id. at 15-17).

Ms. Matheny was questioned separately from Defendant.  During questioning, Ms. Matheny indicated that she knew the location of the firearm supposedly used in the earlier shooting.  (Tr. at 33).  She told Sergeant Morris that the gun was under the mattress in a bedroom of an apartment where she and Defendant had been staying for a few nights, and that the apartment belonged to Defendant's aunt, Vanessa Jackson.[1]  (Id. at 21-22, 45, 47).  Ms. Matheny

---

[1] At the evidentiary hearing, Ms. Matheny testified about her access to Ms. Jackson's apartment.  Ms. Matheny testified that she did not have a key to Ms. Jackson's apartment and that in order to enter the apartment, Ms. Matheny would knock on the door. (Tr. at 49-50, 64).  Ms. Matheny testified that she never stayed at Ms. Jackson's apartment without Defendant and that neither she nor Defendant paid rent to Ms. Jackson or received mail there.  (Id. at 49-50, 51, 64).  Ms.

volunteered that she could show law enforcement officers where the gun was located. (Id. at 23, 52, 64). Ms. Matheny also offered to go into Ms. Jackson's apartment alone and retrieve the weapon, but the law enforcement officers rejected this idea. (Id. at 24, 53). The officers also rejected the idea of obtaining a search warrant. (Id. at 24). Sergeant Morris gave the following testimony regarding the decision not to obtain a warrant:

> We discussed several options, first and foremost being a search warrant, but based on the fact that we had been up a number of hours at that point as well as the fact that we still had some investigation to do upon talking to [Defendant] and some follow up with him and the expedience of the gun possibly – you know, we didn't know what the situation was about whether it could be moved or we didn't want it to get away so we didn't want to take the time in order to get a search warrant.

(Id.). Rather than obtain a warrant or allow Ms. Matheny to bring the weapon to them, the officers developed a plan whereby Sergeant Morris would accompany Ms. Matheny to Ms. Jackson's home and pretend to be Ms. Matheny's cousin in order for Sergeant Morris to gain entry into Ms. Jackson's apartment and retrieve the gun. (Id. at 23-24, 54-55).

---

Jackson testified that Ms. Matheny was not permitted to stay at Ms. Jackson's apartment without Defendant, and that Ms. Matheny was not permitted "to come and go as she pleased." (Id. at 71).

3

That evening, Sergeant Morris, Ms. Matheny, and two other officers traveled to Ms. Jackson's apartment. (Tr. at 25-26). When they arrived, Sergeant Morris and Ms. Matheny walked to the apartment door while the other officers stayed in the car. (Id. at 26-27). Ms. Matheny knocked on the door and when Ms. Jackson answered the door, Ms. Matheny introduced Sergeant Morris (who was wearing plainclothes and did not display his badge or gun) as her cousin, stating that they were there to retrieve personal items belonging to Ms. Matheny and Defendant. (Id. at 27, 37-39, 69-70). Sergeant Morris was not, in fact, Ms. Matheny's cousin; this statement was a lie[2] designed to gain entry into Ms. Jackson's apartment by deception. (Id. at 37-39).

Ms. Jackson, unaware that Morris was a law enforcement officer, allowed them into her apartment. (Tr. at 39, 71). Ms. Matheny told Ms. Jackson that they were there to get some of Defendant and Ms. Matheny's clothing from the room where she and Defendant had been staying. (Id. at 72-73). Once inside the apartment, Ms. Matheny led Sergeant Morris to the room where she and Defendant had been sleeping, pointed to the location of the gun, and then left to speak with Ms. Jackson. (Id. at 28). Sergeant Morris entered the bedroom, "pushed the door

---

[2] Although he admitted that he was not Ms. Matheny's cousin and that what they told Ms. Jackson was not the truth, Sergeant Morris objected to the word "lie," preferring instead the term "investigative technique." (Tr. at 38).

4

closed just a little bit," put on a latex glove, retrieved the gun, placed it into an evidence bag that was concealed in his pocket, and then concealed the gun and evidence bag in a bag of clothing. (Id. at 28, 56-58). Soon thereafter, the pair left Ms. Jackson's apartment and headed back to the McDonough police department. (Id. at 30). They had been in Ms. Jackson's apartment for less than five minutes. (Id.).

It is undisputed that law enforcement did not have a warrant to enter Ms. Jackson's home. (Tr. at 36). It is also undisputed that there were no exigent circumstances justifying a warrantless search. (Id. at 36-37; Doc. 23 at 5). There was no evidence that anyone, other than Defendant and Ms. Matheny (who were both detained by law enforcement) knew about the gun located in Ms. Jackson's apartment, and no evidence of a danger to the premises or risk that the gun would be destroyed or concealed. (Id. at 37). Ms. Jackson testified that she did not know that Sergeant Morris was a law enforcement officer, and if she had known that he was, she would not have allowed him to enter her apartment without a warrant. (Id. at 71-72).

## II.  DISCUSSION

Defendant argues that he had a reasonable expectation of privacy in the room searched by law enforcement, that Ms. Matheny did not have the capacity to

5

consent to the search, and that Ms. Jackson did not provide knowing and voluntary consent to Sergeant Morris's search of the bedroom in Ms. Jackson's apartment. (Doc. 22, 24). As framed by the Government, the only issue for this Court to resolve is whether police acted reasonably in relying on Ms. Matheny's consent when they conducted a warrantless search of the bedroom at Ms. Jackson's apartment and seized the gun from under the mattress.[3] (Doc. 23 at 1).

A. Legal Standard

The Fourth Amendment to the United States Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and ensures that judicial warrants for such searches will not be issued "but upon probable cause." U.S. Const. amend. IV. Thus, "[t]he Fourth Amendment generally prohibits the warrantless entry of a

---

[3] In its brief, the Government makes clear that the sole issue before the Court is whether Ms. Matheny's consent was sufficient to validate the warrantless search:

> [t]he Government is not arguing that Defendant's aunt, Vanessa Jackson, gave consent, that exigent circumstances existed, or that Dusty Matheny was not acting on behalf of law enforcement. Nor is the Government arguing that Defendant lacks standing. But Matheny too had legitimate access and a reasonable expectation of privacy in the bedroom she shared with the Defendant for those days in September 2011. And the officers here reasonably believed that Matheny was authorized to consent.

(Doc. 23 at 5).

person's home, whether to make an arrest or to search for specific objects." Ill. v. Rodriguez, 497 U.S. 177, 181 (1990). It is a cardinal principle of United States jurisprudence that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." Cal. v. Acevedo, 500 U.S. 565, 580 (1991); see U.S. v. Yeary, 740 F.3d 569, 579 (11th Cir. 2014) ("It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."). Where, as here, there is no dispute that the defendant had a legitimate expectation of privacy in the area searched, the burden is on the Government to prove that the search was reasonable based upon a recognized exception to the warrant requirement. U.S. v. Bachner, 706 F.2d 1121, 1125-26 (11th Cir. 1983).

In this case, the relevant exception to the warrant requirement is consent. "[T]he Fourth . . . Amendment[ ] require[s] that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting "consent" would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973); see Yeary, 740

F.3d at 581-82. Whether consent is voluntary is a fact question determined according to the totality of the circumstances. Johnston v. Tampa Sports Auth., 530 F.3d 1320, 1326 (11th Cir. 2008). While the police do not have to inform an individual of his right to refuse, the absence of such a warning is considered in the totality of the circumstances analysis. See Bustamonte, 412 U.S. at 227; U.S. v. Chemaly, 741 F.2d 1346, 1353 (11th Cir. 1984).

Moreover, the consent must be given by an individual possessing "common authority" over the premises. Bates v. Harvey, 518 F.3d 1233, 1244 (11th Cir. 2008) (citing Rodriguez, 497 U.S. at 181). Common authority rests on mutual use of the property by persons generally having joint access or control for most purposes. U.S. v. Matlock, 415 U.S. 164, 170 (1974) (holding that the consent of one co-occupant to conduct a warrantless search of a home was sufficient to give the police the power to search despite the objection of an absent, non-consenting co-occupant); Rodriguez, 497 U.S. at 181 (holding that a warrantless search was valid where, at the time of entry, the police reasonably believed that a consenting third party possessed common authority over the premises, but the third party did not, in fact, possess such authority). "[A] warrantless entry is valid when it is based upon the consent of a third party whom the police, at the time of entry, reasonably believed possessed authority over the premises." U.S. v. Mercer, 541

F.3d 1070, 1074 (11th Cir. 2008). The "ultimate touchstone of the Fourth Amendment is reasonableness." Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (internal citation and quotation omitted).

In its 2006 opinion in Georgia v. Randolph, the United States Supreme Court made clear that if a search is conducted over the objection of a physically present co-occupant, the search is unconstitutional; the cooperating tenant's permission does not suffice for a reasonable search in the face of such an objection. 547 U.S. 103, 120 (2006). Thus, a warrantless search of a shared dwelling, such as the apartment at issue in this case, over the express refusal of consent by a physically present resident "cannot be justified as reasonable as to [that resident], on the basis of consent given to the police by another resident." Id.; see Fernandez v. Cal., __ U.S. __, 134 S.Ct. 1126, 1134-37 (2014). Moreover, "police may not rely on a third party's consent to intentionally bypass a person who is present, has a superior privacy interest in the premises, and actively objects to the search." U.S. v. Esparza, 162 F.3d 978, 980 (8th Cir. 1998).

B. Analysis

Here, it is undisputed that Ms. Jackson was present at the time of the search and that Ms. Jackson did not consent to the search. (Doc. 23 at 5). The Government argues only that the officers reasonably believed that Ms. Matheny

9

had legitimate access and a reasonable expectation of privacy in the bedroom she shared with Defendant.  (Id.)

Based on the facts known to the officers at the time of entry, I find that the officers could not have reasonably believed that Ms. Matheny possessed common authority over the premises sufficient to consent to their entry into Ms. Jackson's apartment and justify the warrantless search and seizure of the gun.  The police officers knew that Ms. Matheny had stayed with Defendant at Ms. Jackson's apartment for only "a few nights."  They knew that Ms. Matheny did not have a key.  They knew that Ms. Matheny had to knock to gain access to the apartment.  And most tellingly, it appears that they knew that they needed to deceive Ms. Jackson in order to gain access to her apartment.  If Ms. Matheny possessed authority over the premises, there would be no need for Sergeant Morris to conceal his identity in order to enter the apartment or, once inside the bedroom, to push the door closed "just a little bit" and conceal the gun after its retrieval.  If the officers reasonably believed that they had valid consent, they would not have had to construct a deceptive scheme to gain access to the apartment.  The officers' actions in concocting the scheme belie any argument that they "reasonably" believed Ms. Matheny had access to the apartment and/or the ability to consent to the search of Ms. Jackson's apartment.  While they may have reasonably believed that Ms.

Matheny had access to the bedroom, the officers knew very well that the apartment belonged to Ms. Jackson, and they evidently believed she would not agree to the search.

Moreover, I find that given the information available to him, it was unreasonable for Sergeant Morris to stand on the threshold of Ms. Jackson's home and proceed with the search without first obtaining Ms. Jackson's consent. Morris lied about who he was, deliberately deceiving Ms. Jackson so that he could avoid giving her the opportunity to object to the warrantless search of her apartment. This can be seen by Sergeant Morris's testimony concerning his plan in the event that the scheme to enter Ms. Jackson's apartment was not successful:

> We discussed the fact that if [Ms. Jackson] was uncooperative for any reason that we would lock the apartment down and at that point go and obtain a search warrant or identify ourselves as police officers, at least, and try to gain consent.

(Tr. at 25). Thus, Sergeant Morris believed that if Ms. Jackson refused to allow them to enter, they could not enter. This understanding is contrary to the Government's position that the officers reasonably believed Ms. Matheny had sufficient access and control over the apartment to consent to a search. According to his own testimony, Sergeant Morris planned to obtain valid consent by identifying himself to Ms. Jackson as a police officer and requesting her consent ***only as a last resort if the scheme failed.*** This testimony is inconsistent with a

11

belief that the search was pursuant to valid consent, and the Government's argument rings hollow.

The Government argues that because Ms. Matheny had the right to enter the apartment alone to retrieve the gun, it would be "irrational" for this Court to rule that Sergeant Morris could not lawfully accompany Ms. Matheny into Ms. Jackson's apartment and extract the gun himself. (Doc. 23 at 12). But the United States Supreme Court addressed precisely this argument in Randolph, stating:

> But society can often have the benefit of [the centuries-old principle of respect for the privacy of the home] without relying on a theory of consent that ignores an inhabitant's refusal to allow a warrantless search. The co-tenant acting on his own initiative may be able to deliver evidence to the police, [Coolidge v. N.H., 403 U.S. 443, 487-89 (1971)] (suspect's wife retrieved his guns from the couple's house and turned them over to the police), and can tell the police what he knows, for use before a magistrate in getting a warrant.

547 U.S. at 116-117. Thus, the Supreme Court has made clear that when faced with a physically present co-tenant who objects to a warrantless search, law enforcement must either (1) rely on the cooperating tenant to deliver the evidence on her own or (2) use the information provided by the cooperating tenant to obtain a search warrant. Here, law enforcement did neither.

The Government cites to an unpublished Eleventh Circuit opinion, U.S. v. Weeks, 442 F. App'x 447, 453 (11th Cir. 2011), in support of its argument that the officers reasonably believed that Ms. Matheny had authority to consent to the

search of Ms. Jackson's apartment. In <u>Weeks</u>, the Eleventh Circuit affirmed the reasonableness of a search based on the consent of a third party – the defendant's girlfriend – where the girlfriend was present when a team of agents entered defendant's apartment to arrest him and consented to a search of the apartment. In <u>Weeks</u>, the Eleventh Circuit addressed the issue of whether the girlfriend could consent, noting that the girlfriend had mutual use of the property, treated the apartment as her own home, and shared both the master bedroom and a set of keys to the apartment with the defendant. The Eleventh Circuit concluded that even if the girlfriend did not have actual authority to consent, "she had at least apparent authority." <u>Weeks</u>, 442 F. App'x at 454.

The facts in the instant case are readily distinguishable from <u>Weeks</u>. Far from concealing their identities or creating a ruse to gain access to the apartment, the agents in <u>Weeks</u> were open about their purpose; they knocked on the door, yelled "police," and then forced their way inside the apartment. <u>Weeks</u>, 442 Fed. Appx. at 450. When the officers entered, they encountered Mr. Weeks's girlfriend who – unlike Ms. Jackson – gave her consent to search the apartment. <u>Id.</u> Moreover, in the instant case, there is no evidence of mutual use of the property other than Ms. Matheny's statements that she had stayed in a bedroom of Ms. Jackson's apartment with Defendant for approximately three nights, and that she

had some shoes, clothes, and toiletries in the bedroom. Unlike the girlfriend in Weeks, Ms. Matheny did not have a key to the apartment and was not permitted to come and go as she pleased. Ms. Matheny did not have the level of shared use and authority over Ms. Jackson's apartment that was present in Weeks. For all these reasons, the undersigned does not find Weeks persuasive.

If the Government's position were adopted, the consent exception to the warrantless search rule would be improperly expanded, allowing law enforcement officers the discretion to override the Fourth Amendment rights of citizens to refuse to consent to warrantless searches. Suppression of the evidence in this case is necessary to ensure that law enforcement is never too tired or too busy to honor the Constitution that they have taken an oath to uphold. As explained by the Supreme Court nearly ten years ago, when there are no exigent circumstances, and the residents present at the site of the search do not consent to the search, law enforcement must obtain a warrant. See Randolph, 547 U.S. at 120. The Government has not met its burden to establish that Sergeant Morris had valid consent to search Ms. Jackson's apartment, or that it was reasonable for Sergeant Morris to rely on Ms. Matheny's consent when he conducted a warrantless search of Ms. Jackson's apartment. Accordingly, I conclude that the warrantless search of

Ms. Jackson's apartment was unreasonable and that the fruits thereof should be suppressed.

### III.   CONCLUSION

For the foregoing reasons, I recommend that Defendant's Motion to Suppress Evidence (Doc. 18) be **GRANTED**.

**SO REPORTED and RECOMMENDED** this 6th day of January, 2016.

_____
CATHERINE M. SALINAS
United States Magistrate Judge